# McMullin et al., Appellants, *v.* Westinghouse Estate et al.

*Corporations—Management by creditors—Sale of assets—Purchase by sole stockholder and president—Alleged fraud—Trusts and trustees—Bill in equity—Dismissal.*

A bill in equity brought by certain creditors of a corporation sought to impose liability on a decedent's estate on the ground that the decedent's acquisition of the assets of the corporation was a breach of the relationship of trust and confidence in which he stood to complainants, and fraudulent. It appears that deceased had been president of the corporation and owner of all its stock. The corporation was placed in the hands of a receiver and thereafter the creditors perfected a plan, in which complainants joined, under which the receiver was discharged and the creditors controlled the company, naming six of its nine directors, and managed its affairs by an executive committee composed of three of the six directors they had appointed. The company was unable to meet its obligations and its securities were sold at public auction, and were purchased by deceased as the highest bidder. The court found on amply sufficient evidence that after the creditors assumed control deceased took no part in the affairs of the company and had no control over them, and that deceased did not procure the sale to be made and possessed no means to prevent its taking place. *Held,* (1) the mere fact that deceased was the sole stockholder did not render the transaction a fraud, (2) no relationship of trust and confidence existed between deceased and complainants at the time of the sale, and (3) the bill was properly dismissed.

Argued Oct. 15, 1917. Appeal, No. 145, Oct. T., 1917, by plaintiffs, from decree of C. P. Allegheny Co., Jan. T., 1917, No. 1228, in equity, dismissing bill in equity to have defendants declared trustees, in case of M. K. McMullin and Frank H. Clark, Partners, Doing Business as M. K. McMullin & Co., for Themselves and Such Other Creditors of the Security Investment Company (Other

Than the Defendants) Who May Desire to Intervene and Become Parties Plaintiff, The Allegheny Trust Company v. H. H. Westinghouse, Walter D. Uptegraff and Charles A. Terry, Executors of the Estate of George Westinghouse, Deceased; the Security Investment Company, a Corporation of Pennsylvania; George Westinghouse, Jr., and H. H. Westinghouse, Residuary Legatees Under the Last Will and Testament of George Westinghouse, Deceased. Before BROWN, C. J., POTTER, MOSCHZISKER, FRAZER and WALLING, JJ. Affirmed.

Bill in equity to have defendants declared trustees of assets purchased from Security Investment Company.

The facts appear from the following opinion by SHAFER, P. J.:

The bill is by creditors of the Security Investment Company for themselves and other creditors who may desire to join, to have the executors of the decedent decreed to be trustees of the assets of the Security Investment Company for the plaintiffs and certain other creditors of the same class, and require them to pay to the Security Investment Company such sums as may be necessary to discharge the indebtedness owing to the plaintiffs and others.

### FINDINGS OF FACT.

First. In the year 1907, George Westinghouse was the owner of a large number of shares of stock in the Westinghouse Airbrake Company, Westinghouse Switch & Signal Company, Westinghouse Electric & Manufacturing Company, Westinghouse Machine Company, and other subsidiary companies, he being the president and director of most of these companies.

Second. At the same time Mr. George Westinghouse was the legal owner of all the stock of the Security Investment Company and was the equitable owner of all the shares of stock held by the directors of the company,

such shares having been transferred to them by Mr. Westinghouse for the purpose of qualifying them to act as such directors. This company was incorporated by special act of the legislature of Pennsylvania, approved May 29, 1871, by the name of the Southwest Pennsylvania Improvement Company. It was given extensive powers by its charter and its capital stock had at this time been increased to three million dollars, one million of which was preferred stock and the balance common stock, all of which was fully paid.

Third. The Security Investment Company did not engage in any business, except the holding of securities of the various Westinghouse enterprises above mentioned, and in the year 1907 and for a long time before was solvent, having a considerable surplus.

Fourth. In October, 1907, there occurred a severe financial panic by which the market price of various securities of the Westinghouse companies was greatly reduced, and the stocks of these companies owned by the Security Investment Company, and pledged by it in various banks, were likely to be sacrificed. On the 23d of October receivers were appointed for the Security Investment Company, as well as for others of the Westinghouse companies above mentioned, by the United States District Court for the Western District of Pennsylvania.

Fifth. In February, 1908, the receiver, being the Fidelity Title & Trust Company of Pittsburgh, advised all the creditors of the Security Investment Company that after consultation with the principal creditors they had nominated a Creditors' Committee consisting of officers of the various banks in Pittsburgh and in other cities where Westinghouse securities were held by banks and others. The purpose of this committee was to have the creditors join together in protecting the assets of the Security Investment Company and to aid the receivers in the management of its affairs.

Sixth. Almost half of the assets of the Security Investment Company consisted in stocks and bonds of the

Westinghouse Electric & Manufacturing Company which was also in the hands of a receiver. It was deemed necessary for the rehabilitation of the Westinghouse Electric & Manufacturing Company that new capital should be brought into it by issuing additional shares of its capital stock at par, which were to be taken by the owners of stock in proportion to their shares. In order that the Security Investment Company might do its part in this raising of additional capital for the Westinghouse Electric & Manufacturing Company, a plan and agreement for the extension of its debt and the protection of its interest in the Westinghouse Electric & Manufacturing Company was prepared by the Creditors' Committee, a copy of it being printed as Exhibit A of the bill.

Seventh. This plan provided for the issue of new notes to be taken by the creditors of the Security Investment Company who held the electric stock as collateral, to an amount equal to twenty-five per cent. of the face value of the stock so held by them, the stock procured by the proceeds of these notes to be pledged as security for the notes. The plan also provided as to the notes already held by the creditors of the company that new notes should be given by the Security Investment Company in exchange for the notes already held by the creditors, payable in three years after May 1, 1908, in the case of creditors who had collateral aggregating or exceeding the face amount of the notes, and in the case of other creditors, whether secured in part or unsecured, notes maturing in five years from May 1, 1908, were to be given.

Eighth. It was further provided that all the stock of the Westinghouse Electric & Manufacturing Company which was held as security for any notes then outstanding, as well as the new stock to be purchased, should be deposited with the Fidelity Title and Trust Company but should continue to be security for the notes for which it

was originally pledged; and that the company should have the right to vote all the stock so deposited.

Ninth. It was further provided that the board of directors should be increased to nine members and provisions satisfactory to the Creditors' Committee should be made so that, as long as any of the notes remained unpaid, six of the members of the board of directors should be persons approved in writing by the committee.

Tenth. This plan, dated March 6, 1908, but not actually executed until December, 1908, was submitted by the creditors' committee to all creditors of the Security Investment Company, with the recommendation that it be signed, and it was signed by almost all the creditors, and among others by the plaintiffs.

Eleventh. Upon the presentation of this plan and agreement to the United States Court the company was taken out of the hands of the receiver and the change in the number of directors agreed upon was made, and six directors were elected who were nominated by the Creditors' Committee, the stock of the company being voted by the Safe Deposit & Trust Company, to whom it had been transferred by Mr. Westinghouse as trustee, to insure the carrying out of the agreement with the creditors as to control of the company.

Twelfth. After this plan of extension had been put in operation, the Security Investment Company entered upon no new business but its sole business consisted in attempting to liquidate its indebtedness by sale of securities and to procuring reductions from its creditors. In the meantime, before the maturity of the notes which ran for five years, Mr. Westinghouse purchased a large number of claims of creditors, for most of which he paid less than face value and for some very much less.

Thirteenth. At the 1st of May, 1913, when all the notes were due and the company had failed, owing to the continued depression in the value of the securities, to raise sufficient money to pay the debts, although a large number of the shares pledged had been sold and a large num-

ber of notes secured by them had been paid, and all of
the new notes which all fell due on that day were still out-
standing, the Fidelity Title & Trust Company, Trustee,
which held these notes and securities, took up the matter
of selling out the securities. It appears to have been
agreed by the parties concerned that it was not wise to
attempt to sell these securities at that time on account
of the state of the market. At this time there were in
various Pittsburgh banks notes of Mr. Westinghouse to
the amount of $666,000, which he had given for the pur-
pose of supplying the deficit left by the failure of all the
creditors to pay 25% of new money into the affair for the
purpose of rehabilitating the Westinghouse Electric &
Manufacturing Company, and there were other notes be-
longing to other persons outstanding, so that the whole
amount of money which was necessary to pay the secured
notes, with interest and expenses, was $1,614,700. Mr.
Westinghouse, in the summer of 1913, made efforts to
provide for the money necessary to bid this amount when
the stock should be sold and among others he attempted
to procure the same from plaintiffs. He afterwards ob-
tained the money by an arrangement with the Westing-
house Airbrake Company.

Fourteenth. The securities were thereupon advertised
for sale in accordance with the provisions of the trust in-
denture at auction on October 7, 1913. When they were
sold Mr. Westinghouse bid for them $1,614,700, and they
were sold to him at that price. He paid for them by hav-
ing the notes surrendered to the trustee and cancelled
and issued his own notes to the holders of the securities
so cancelled for one-half thereof, pledging Westinghouse
Electric stock purchased by him at the sale, and paying
the other half in cash.

Fifteenth. Shortly thereafter Mr. Westinghouse pro-
ceeded to sell the Westinghouse Electric stock so acquired
by him, the plaintiffs acting as his brokers for the sale
of the whole of it, and the proceeds were used to take up
the notes.

Sixteenth. Mr. Westinghouse died March 12, 1915, and the defendants were appointed executors and his estate has been distributed in the Orphans' Court.

Seventeenth. After the change in the directorate of the Security Investment Company provided for by the plan of extension the affairs of the company were managed by an executive committee appointed by the board, composed of three of the directors who were designated by the Creditors' Committee; and Mr. Westinghouse as president and director took no active part in the affairs of the company and had no control of them. The sale made in October, 1913, was not procured by Mr. Westinghouse to be made, nor did he have any control or other means by which it could have been prevented.

Eighteenth. The claim of the plaintiffs against the Security Investment Company is $130,253.05, with interest, and is an entirely unsecured claim, being the balance of an account with the company as brokers, for which the plaintiffs received in December, 1908, a new note made by the Security Investment Company under the plan of extension.

### CONCLUSIONS OF LAW.

First. The plaintiffs contend, first, that under the facts of this case the Security Investment Company in incurring the debt to the plaintiff was in equity the agent of George Westinghouse, and that its debt was his; and secondly, that under the facts of the case, when George Westinghouse purchased, at the sale made by the Fidelity Title & Trust Company, on October 7, 1913, he took the shares purchased by him subject to a trust for the general creditors of the Security Investment Company, as to any excess of value or proceeds over the amount paid by him.

Second. As to the first contention of the plaintiffs, that Mr. Westinghouse is liable for the debts of the Security Investment Company because it was his agent, we are unable to see anything in the facts of the case which

would indicate any such agency, unless it is contended that the fact that Mr. Westinghouse owned all the stock of that company made it his agent. We do not conceive that this is really the plaintiffs' contention, but rather that the claim is that as Mr. Westinghouse owned all the stock of the Security Investment Company all its debts were his personal debts as being contracted by him although under another name. In other words, that the Security Investment Company was a mere alias for George Westinghouse. That courts will in proper cases look behind the act of incorporation and deal with the real owners to discover and control fraud there is no doubt, but the mere fact that one person is the sole stockholder in a corporation does not make him the same person with the corporation: Monongahela Bridge Company v. Pittsburgh & Birmingham Traction Company, 196 Pa. 25. We are therefore of opinion that Mr. Westinghouse is not liable for the note of the plaintiff upon this theory.

Third. Even if he were so liable, the plaintiff could not recover in this proceeding but must proceed by an action at law or, as Mr. Westinghouse is dead, against his estate in the Orphans' Court. No ground of equitable relief is presented by such a case, and the want of equity jurisdiction has been pleaded.

Fourth. The other, and as we apprehend the main ground upon which plaintiff prays for relief in this case, is the contention that under the circumstances Mr. Westinghouse was incapable of buying the shares from the Fidelity Title & Trust Company, Trustee, except as a trustee for the creditors of the Security Investment Company, because he was president of the company and a director of it, and the owner of its stock. It does not appear that, so far as the ownership of the stock is concerned, there is any difference in the relation to the company or its creditors, between the stockholder who owns part of the stock and one who owns all of it. Unless there is actual fraud in the case he is to be treated in

each case as a mere stockholder.  As a stockholder he may, of course, deal at arm's length with the company. As president and director of the company his relation is different, and if it appeared that acting in either capacity he had control of the sale it might be that he could not purchase for himself.  In this case, however, it appears that the majority of the directors were named by the Creditors' Committee, and all of the executive committee were named by them, and that Mr. Westinghouse had no real control of the company and no means of controlling the sale, and further, that he had no funds nor were any funds available for the payment of the debt on which the sale was made.  We are therefore of opinion that the purchase by Mr. Westinghouse of the shares in question, under the circumstances in this case, was not a purchase in trust for the Security Investment Company or its creditors.

The bill must, therefore, be dismissed, with costs to be paid by the plaintiffs.

The lower court dismissed the bill.  Plaintiffs appealed.

*Error assigned,* among others, was in dismissing the bill.

*Samuel McClay,* with him *David A. Reed,* of *Reed, Smith, Shaw & Beal,* for appellants.

*George B. Gordon,* of *Gordon & Smith,* with him *John G. Buchanan,* for appellees.

PER CURIAM, January 7, 1918:

The complaint of the appellants in seeking to impose liability upon the estate of George Westinghouse, deceased, is that his acquisition of the assets of the Security Investment Company constituted and was a breach of the relationship of trust and confidence in which he stood to them, and was a fraud in law and equity upon their

rights. The thirty-fifth fact found by the learned chancellor below, at the request of the appellees, is: "Mr. Westinghouse did not at the time of any of the purchases made by him from the Security Investment Company occupy any relation of trust or confidence to the company with reference to said sales, or any of them, nor did he have any voice or exercise any influence as to the amount of money which the Security Investment Company was willing to take for said property or any of it." This fact, justified by the evidence, put an end to complainants' case. The material facts appear in the opinion of the court below dismissing the bill, and, on that opinion, subsequently immaterially modified as to the third finding of fact, the decree is affirmed at the costs of the appellants.